Filed 12/3/25  P. v. Smith CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>GEORGE RICHARD SMITH,<br><br>   Defendant and Appellant. | F086451<br><br>(Super. Ct. No. BF181640A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

William Safford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs, Edrina Anderson, and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant George Richard Smith raises several claims after being convicted of several crimes following the murder of his wife. We conclude the court erred in admitting hearsay evidence, but the error was not prejudicial. The Attorney General concedes that sentencing error occurred. We accept that concession, reverse the sentence and remand for resentencing, while otherwise affirming the judgment.

## BACKGROUND

In an amended information filed on April 26, 2023, the Kern County District Attorney charged defendant with willful, deliberate and premeditated murder (count 1, Pen. Code,[1] § 187, subd. (a)) with a deadly weapon enhancement (§ 12022, subd.(b)(1)); arson of an inhabited structure (count 2, § 451, subd.(b)); and reckless evasion of a peace officer (count 3, Veh. Code, § 2800.2).) The amended information also alleged several sentencing factors under California Rules of Court, rule 4.421 (rule 4.421).

A jury convicted defendant of second degree murder, finding the premeditation/deliberation allegation not true. The jury also convicted defendant of arson and reckless evading of a peace officer. The jury found the deadly weapon enhancement true.

Defense counsel agreed to a court trial of the sentencing allegations. At the court trial, the court found true beyond a reasonable doubt three sentencing allegations: that count 1 involved great violence, great bodily harm, or cruelty, etc. (rule 4.421(a)(1)), that defendant used a weapon (rule 4.421(a)(2)) as to count 1,[2] and that the manner in which

---

[1] Subsequent statutory references are to the Penal Code unless otherwise noted.

[2] While additional sentencing factors were alleged in the information as to count 1, the prosecutor only sought these two findings at the court trial. The court's minute order reflected not true findings as to the factors alleged in the information but abandoned at trial. As discussed further below, the court also found not true the factors alleged as to count 3. While the prosecutor did not abandon these factors at trial, the trial evidence was submitted without additional evidence or argument.

2.

count 2 was committed indicated planning, sophistication, or professionalism (rule 4.421(a)(8)).

The court sentenced defendant to 15 years to life in prison on count 1, plus one year for the weapon enhancement, plus a consecutive upper term of eight years on count 2, plus a concurrent upper term of three years on count 3.

## FACTS

### *Fire and Discovery of Victim's Body*

Ridgecrest Police Detective Franklen Mixon responded to a fire at the home of George and Vickie Smith on June 30, 2020, shortly after 10:06 a.m. With the fire extinguished, Detective Mixon entered the house and discovered a deceased female in a t-shirt and no underwear on a bed in the master bedroom. She was identified as defendant's wife, Vickie Smith. Something was covering her face, which appeared to one of the detectives to be a thin sheet. A piece of fabric on the bed had "red stuff" on it, which detectives believed to be blood. Defendant George Smith was not in the home; a doorbell camera video from one of defendant's neighbors, showed defendant leaving the house in his truck at 10:03 a.m. on June 30, 2020.

Vickie's throat had been "basically slit from ear to ear," with a cut five and a half inches long. The cut was deep enough to cause sharp-force damage to the bone of the neck/spine.

The largest amount of blood was not found directly under Vickie, but instead to the right of her right arm, which the crime scene investigator opined may have been due to being moved postinjury.

Chris Cagle, a Kern County firefighter assigned as an investigator with the arson investigation unit, was dispatched to the fire at approximately 10:30 a.m. Due to travel time, he arrived on scene likely two hours after the initial dispatch. Cagle observed the most substantial fire damage had occurred near a couch in the living room. Cagle eliminated several possible accidental causes in the area, including several nearby outlets.

3.

In the area the fire likely originated, Cagle found an upside down mixing bowl. Cagle turned it over and smelled a strong odor of gasoline. Underneath the mixing bowl was a plastic item that was melted to the floor. Cagle said the item's shape and pattern was consistent with being a fuel can.

Cagle also located a spot in the master bedroom with significantly more damage compared to its surroundings. There was also a "V pattern" of soot in the room, which often points to the fire's area of origin. Cagle believed the bedroom fire originated on a portion of a bed in the room, which now had exposed coils.

Cagle also observed that the hallway between the living room and master bedroom had less damage. This led Cagle to conclude that two separate fires had started, one in the master bedroom and one in the living room.

Ultimately, Cagle ruled out accidental causes of the fires, and opined that their cause was "incendiary or arson."

### Defendant's Arrest

Later, on June 30, 2020, at around 5:00 p.m., Ridgecrest Police Officer Nathan Lloyd was notified via dispatch that a suspect vehicle (a gold Toyota Tundra) had entered the City of Ridgecrest. Officer Lloyd pursued the vehicle with his lights and siren activated. The vehicle did not comply with stop signs and at one point drove an estimated 70 miles per hour in a residential zone, evading Officer Lloyd after one or two minutes of pursuit. Officer Lloyd identified defendant as the driver at trial.

Kern County Sheriff's Deputy Kevin Parsons eventually located defendant's vehicle at an ARCO station. Deputy Parsons contacted defendant inside the convenience store. Defendant initially refused to provide his name, then said his name was Michael Smith. Defendant appeared to be intoxicated and slurred his words a "little bit," but he could walk.

Ridgecrest Police Captain Aaron Tucker was dispatched to the ARCO station. Captain Tucker observed a shotgun laying on the passenger floorboard of defendant's

4.

vehicle and a revolver on the front passenger seat. A search of the truck did not locate any weapons capable of causing Vickie's injuries. Multiple cans of Bud Ice were located on the front passenger floorboard.

Officer Parsons handcuffed defendant and sat him on a curb near the ARCO station. Officer Parsons was surreptitiously recording at the time. Officer Parsons spoke with defendant about the guns in his vehicle before defendant said,

> "I- I did a fucking bad fucking thing. I don't know why they fucking brought those things out. I never fucking used them. I'm a fucking idiot. And, we cleared it – stuck it totally, and we cleared it, turned to, uh, Kennedy Meadows. Sat there for a while, watched the fucking river and came back. And that's it. You guys, I fully expected you guys to find me… Here we go. This is what I expected to happen. You guys didn't fuck around because it's been only minutes since I've been back in town. […] I don't know what happened. I don't know what happened. Oh, my God, I don't know what the fuck happened. […] I don't know what happened. That's why I came back to face my fucking fate. Here I am. 'Cause, I realize that it was fucking bullshit. I don't know what the fuck happened, I don't. […] I deserve whatever happens."

Shortly thereafter, defendant continued, "I love my wife so fucking much. Oh my God. [unintelligible[3]] That's why I had to come back and be a man and fucking face this shit."

When asked about drinking, defendant said, "I drank a little bit of beer. I have not been really drunk." Defendant told Parsons he had been fighting with Vickie over bills. Defendant said he makes the money and she spends the money.

Defendant continued:

> "I've got to tell you guys, I did come back here for you guys to catch me. I did. I came back [for] you guys [to] catch me, because this is fucking bullshit. I can't believe I did this."

---

**3**      The transcript of the recording indicates defendant said, "I killed her" here. However, we have reviewed the audio of the call (Exhibit 78) – which is the actual "evidence" admitted for the jury's consideration. It appears to us defendant might have actually said, "I can't believe—" instead of "I killed her."

Defendant said he had gone up to Kernville. He said, "I went further up there than I've ever been in my whole life, just to fucking go up there and see it, 'cause I know this is my last of my days, and came back." Defendant again claimed he "only drank a couple of beers the whole time."

Officer Mike Ogas then took custody of defendant. Ogas left the recorder on even after placing defendant in his patrol vehicle. Defendant said, "Oh my God. I'm so fucked. I needed to fucking run from them. I should have killed myself. Motherfucker. They caught me. The motherfuckers, they fucking caught me. Fuck. That sucks so bad." Defendant later continued, "I'm not going to try to get away or nothing. I already fucked up." He said, "I'm not going to try to get away. I- I know what I did and I'm ready to fucking face it. So, I'm not going to get away from you guys. Oh, God." Later still, defendant said, "I'm going to be a man and take it like a man. What I fucking did was stupid. I fucking love my wife."

Defendant later stated:

> "I came back so you guys could catch me and you guys did. And, it's fully what I expected to happen. I'll be a man about it. It's fucking bullshit. It's my wife and I fucking love her so much. I'd fucking die for her in a fucking split second and I stabbed her. [¶] What the fuck. She's a major fucking alcoholic. But still, I dealt with it for years and years. I guess I finally fucking lost it. I'm probably not supposed to tell you that shit. I- I- I fucked up. I fucked up. Oh my God. Oh my God. I can never live with myself again. I should have killed myself or something. I can't fucking believe I didn't kill myself. I- I protected her all her fucking life. [unintelligible] I was a dumbass. Oh my God. I'm a very hardworking man, too. Just like you. Every fucking day. Blue collar. I worked my fucking ass off and shit, and I can't believe that something like this fucking happened. I just can't fucking believe it."

Profile DNA results from stains on defendant's clothing matched defendant's DNA. Vickie was excluded as a potential contributor to the stains.

**Autopsy**

Vickie's autopsy was performed by medical examiner Dr. Eugene Carpenter, Jr. Dr. Carpenter opined that, based on the condition of her body, Vickie was lying on her

back at the time of the fire.  There was no soot in Vickie's airways, indicating she was not breathing smoke for a reasonably significant amount of time.  It was "fair to say" that Vickie died within 10 to 15 minutes of her neck injury.

There were bruises on Vickie's body that occurred before she died.  One bruise on the left temple area of her head was one and a half by one inch in size.  This injury was consistent with an injury that could render someone unconscious.  Another bruise one-quarter inch in size was located at the top of the left lateral shoulder.  Both bruises were consistent with being "fresh" bruises.  However, it could not be conclusively determined that the bruises were fresh, because carbon monoxide can change blood to a "very cherry red" color.

There were no signs of neck compression on Vickie's body.  However, that did not rule out the possibility Vickie had been choked recently.

There were additional slight cuts at the margins of the gaping neck wound.  Hypothetically, these marks could be caused by "wiggling" the cutting instrument to disengage it or to go deeper.  The wound could have been caused by a machete or heavier kitchen knife.

There was a "considerable amount" of air in Vickie's heart, which was not normal.  It can be caused by decomposition or when the person's throat is cut while their heart was still beating.

Dr. Carpenter did not observe any defensive wounds on Vickie's body.

Dr. Carpenter determined Vickie's cause of death to be a cut throat and the manner of death to be a medical homicide.

***Friends and Neighbors***

Denise O. (Denise) testified that she and Vickie were best friends who had known each other for about 25 years.  The two talked frequently on the phone and met in person once or twice a month.  Vickie referred to defendant – whose middle name is Richard – as "Rich."

7.

On June 21, 2020,[4] Vickie sent Denise a text message reading: "So only telling u..pls don't tell jeff6..but rich [redaction] choked me..pls don't tell anyone."[5]

On June 24, Vickie sent Denise a text message reading: "I'm ok and yes he was drinking but that's no excuse..he's done this twice to me [redaction] he keeps apologizing and professing his love…I told him the next time this happens I will call the police and he will go away for along [*sic*] time.."

On June 25, Vickie sent Denise a text message reading: "Rich just beat the fuck out of me all over the living room..there's a good chance he might [be] arrested after work tomorrow."

June 2020 was the first time Denise had heard the allegations Vickie made in the text messages. In the more than 20 years they were friends, Denise had never seen marks or bruising on Vickie.

***Other Friends and Neighbors***

Several friends, neighbors, and family members testified that defendant was nonviolent and had positive things to say of his relationship with Vickie.

One of defendant's neighbors testified defendant seemed visibly agitated a couple days prior to June 30, 2020. The neighbor also heard arguments coming from defendant's house in the months prior.

***Defendant's Testimony***

Defendant testified that he is an alcoholic. He drank "a lot" on weekends, and would have "a couple of beers after work" on weekdays.

In June 2020, there were several stressors affecting defendant. Drinking was the "number one" stressor. This included both defendant's drinking and Vickie's drinking.

---

[4]    Subsequent references to dates in June are to June 2020.

[5]    A portion of this text message was redacted, as will be explained later in the opinion. The quotation provided here is what the jury saw in the exhibit.

Additionally, defendant was "getting behind in bills" and was "in between jobs." Defendant and Vickie were both on medication for depression.

Defendant would go to the store when needed because Vickie would not wear a mask or use hand sanitizer. Vickie had several medical conditions that made her susceptible to COVID.

Vickie carried around a trash can in which she would vomit "all the time" due to her drinking. Vickie drank pretty much every day. Vickie was beginning to have seizures due to her drinking. Vickie would have defendant go to the store after work to get alcohol for the next day.

In June 2020, Vickie and defendant would get in verbal arguments. The two argued daily. Vickie used to pay the bills and cook, but she was no longer doing anything during the days because she spent them drinking. Sometimes Vickie would not shower for a week.

Vickie would become upset when defendant would try to get her to drink less. The two would get into arguments and both would raise their voices. In the week prior to Vickie's death, they would often argue, then calm down for 30-60 minutes, then resume arguing.

Defendant indicated that he was surprised to hear about Vickie's text messages referenced in prior testimony. Defendant denied choking Vickie in June 2020 and testified their arguments were never physical in June 2020.

Defendant got a job about three weeks prior to June 30, 2020. During his first week back to work, Vickie began drinking more. Additionally, defendant felt that doing physical labor at work made him "more vulnerable" to getting into arguments.

Vickie told defendant she wanted more alcohol than he was buying her. Since Vickie was now home alone, she could go to the store and buy E&J Brandy and Mike's Hard Liquor, which is 24 ounces of eight percent alcohol.

*Defendant's Testimony Concerning June 29, 2020*

On June 29, 2020, defendant would have returned from work around 5:45 p.m. Defendant's daughter's boyfriend, Ben H., was present at defendant's home (or arrived shortly thereafter). Defendant heard the TV in the bedroom and concluded Vickie was home (though he had not seen her yet). Ben stayed for about 30 minutes, then left. Defendant then went to the bedroom and greeted Vickie. She was "drunker than usual." Defendant was concerned because "it was getting worse" and Vickie was "killing herself."

Vickie said she wanted Arby's. Before defendant left to get the food, Vickie asked him to get alcohol on the way back. Defendant went to Arby's, then the liquor store. Defendant purchased two 24-ounce Bud Ice beers (5.5 percent alcohol concentration) for himself and a pint of E&J Brandy for Vickie.

Defendant returned home around 8:00 p.m. and began to drink his first beer. Defendant's hamburger fell on the ground, so defendant decided not to eat dinner. Vickie asked that defendant get more alcohol for the next day. Defendant returned to the liquor store and purchased two more 24-ounce Bud Ice beers for himself and a pint and a half of E&J Brandy for Vickie. Defendant returned home and drank all four beers between 8:00 p.m. and 10:00 p.m.

Defendant and Vickie began arguing about paying bills. They raised their voices during the argument. It was more intense of an argument than usual and it resulted in defendant staying up later than his usual 9:00 p.m. bedtime. Vickie was "mad as hell." She did not like when defendant pointed out she was not showering for extended periods. Vickie was unable to get up without assistance and was "barely" able to walk.

Around 9:40 p.m., they "calmed down" and were watching TV. Eventually, the two sat on the sofa and defendant rubbed Vickie's feet. At 10:00 p.m., defendant took two propranolol pills for anxiety and two Seroquel pills for sleeping, set his alarm, and kissed Vickie on the forehead. Defendant had never taken two propranolol pills at once

10.

before, nor had he ever taken two Seroquel pills at once. However, defendant was more anxious than normal due to the argument. Defendant felt intoxicated before taking the pills.[6] When defendant went to the bedroom,[7] he was not in a good mood and was still "slightly upset." Defendant then went to sleep.

The next thing defendant remembered was looking out the window and seeing Carlos outside in his truck. On a typical day, defendant would leave for work at 4:30 a.m. when he would get a ride with a man named Carlos Herrera.

The next thing defendant remembered after that was being at a store in South Lake Isabella, about one hour and 10 or 15 minutes away. Defendant did not recall leaving his house or driving to the store. Defendant next remembered waking up in his truck with multiple firearms, parked off the side of the road. Defendant did not know how the guns got into his vehicle, nor did he remember how much he drank during these time periods. Defendant next remembered having a police car behind him and then being interviewed at a police station. Defendant did not recall being in a police car.

Defendant denied having any recollection of harming Vickie. Defendant denied having any recollection of a house fire. Defendant's "blackouts" ended while he was in a jail cell in Bakersfield.

Defendant testified he owned a filleting knife capable of making the injuries that Vickie sustained.

### Dr. Michael Musacco

Dr. Michael Musacco was called as a witness both by the defense during its case-in-chief and by the prosecution in rebuttal. Dr. Musacco is a psychologist with training and experience regarding alcohol and the effects of intoxication.

---

[6] Defendant testified that he had previously told a doctor that he did *not* feel intoxicated, but he claimed that was because he defined drunk and intoxicated differently.

[7] On weekdays, defendant slept in the bedroom and Vickie slept on the couch. Vickie would sleep with the TV on, which defendant did not prefer.

Dr. Musacco testified that alcohol can impact a person's mental functioning and stress can aggravate these effects. The extent to which alcohol can affect mental functioning depends on several factors, including tolerance, body weight and gender. Alcohol would have less effect on a heavy male who drinks frequently compared to a light female who does not drink much. Alcohol "shuts off" the frontal portion of the brain, which recognizes danger or inhibits behavior.

Dr. Musacco further testified that Seroquel can cause memory loss and alcohol can increase the potency of Seroquel. However, the effects lessen in a person who drinks and takes Seroquel all the time.

Dr. Musacco testified that he would expect that a functional alcoholic would be aware of their actions and conduct most of the time. Thirty hours is a "pretty long time" for a blackout, and is not "in the wheelhouse" of what Dr. Musacco typically thought for a blackout. "[P]erhaps" it could occur with the right combination of drugs and alcohol, but at a certain point a person would transition from a blackout to passed out. Drinking during a blackout can prolong the blackout.

Dr. Musacco interviewed defendant while defendant was in custody on January 12, 2022, and January 18, 2022. Defendant told Dr. Musacco he was a functional alcoholic and that Vickie was a dysfunctional alcoholic. Defendant said he discovered Vickie had been sneaking extra alcohol from the store, which made him upset. Defendant told Dr. Musacco he had not consumed any alcohol the night of the argument. Defendant told Dr. Musacco he never physically abused his wife.

## DISCUSSION

## I.     The Court Did Not Err in Excluding Evidence of Vickie's BAC and Prior Drunken Beratements of Defendant

Defendant contends the court erred in excluding evidence of Vickie's blood alcohol concentration (BAC) and prior drunken beratements of defendant.

12.

### A. Additional Background

#### 1. *Pre-Trial Filings*

Defendant filed several motions in limine. In one of those motions, defendant sought to introduce evidence at trial of Vickie's BAC. The motion claimed that a toxicology report indicated Vickie's BAC was .17 percent at the time of the "incident." Defendant argued that circumstantial evidence of what occurred that night/morning was necessary "especially" considering that he was "in a state of blackout at the time of the incident." The prosecution countered that evidence of Vickie's BAC was irrelevant (Evid. Code, § 210) and unduly prejudicial (Evid. Code, § 352).

Defendant also filed an offer of proof, which included a defense investigator's report. The report detailed interviews with people who described Vickie's personality and drinking habits. Defendant's friend described Vickie as "very difficult to be around" and said she " 'had a mouth on her.' " Vickie was "verbally abusive" to defendant and had cut him down in front of others.

Another of defendant's friends said Vickie was a heavy drinker and did not treat defendant well. Sometimes "Vickie would joke around with [defendant] and there were 5-6 times when [the friend] saw Vickie hit [defendant's] hands with the remote when he did not do what she wanted." This friend's wife told the defense investigator that Vickie was a challenging person to be around and treated defendant poorly when sober and even worse when drinking. Vickie would cut defendant down and call him " 'stupid.' " Vickie's drinking got worse during the last couple years of her life.

One of Vickie's family members said Vickie was "not nice" to defendant when she drank. Vickie would talk down to him and was "very disrespectful and demeaning to him." Vickie drank heavily.

The investigator's report described what she was told by one of defendant and Vickie's couple friends as follows:

"Vickie did not treat her any differently after she had been drinking. She said Vickie was mostly a happy drunk with her. She would see Vickie's mood change with [defendant] after she had been drinking. [The friend] noticed that Vickie's mood after she had been drinking depended on how things were with her and [defendant]. If Vickie had been complaining to her about [defendant ] when she was sober, she was more likely to get moody and sad or upset more easily when she was drunk."

She also said Vickie would antagonize defendant when she was drunk and "verbally abuse" him over "stupid stuff."

Defendant's neighbor said Vickie's drinking had gotten worse over the last few years. The neighbor did not see her outside often, but when she was outside she seemed heavily intoxicated.

Ben H. told the investigator that on the day he was at defendant's house, Vickie seemed drunk and was mumbling.

### 2. *Court Discussion*

In discussing defendant's in limine motion, the court observed:

"[That Vickie was] berating him [on the night in question] is pure speculation. I don't see -- because there is nobody there to say that she was berating him or giving him a hard time while this was going on. I don't how see the B.A.[C.] could come in because we have no idea of her tolerance level as to the alcohol. [¶] So I'd be keeping out the B.A.[C.] and how it may [have] affected her that night. You can call the witnesses about the bucket and their perceived intoxication as relevant to the text messages. But there's no way of knowing if she was riding him that night. Musacco cannot testify to the victim's alcohol use or how it would have affected the defendant because nobody can testify as to what occurred that evening if the murderer or the person, the defendant, blacked out. It would be pure speculation."

The following exchange ensued:

"[DEFENSE COUNSEL]: … I do have numerous witnesses that I plan on bringing in that say that when she is drinking she argues with him even more and at a greater level based on their own observations when she's intoxicated versus when she's not and that that's when they see her antagonizing him. [¶] So is the Court excluding those witnesses from testifying about their observations about when she's antagonizing my client when she's drunk?

"THE COURT: If you have witnesses that will testify that what was going on on the day of the homicide, that she was drunk and antagonizing him and they saw that, I would be tempted to allow that. But what was happening leading up to that, we have no information that it was happening on the date that apparently set him off.

"[DEFENSE COUNSEL]: Okay. So the Court is excluding witnesses from saying in general when she gets drunk she antagonizes him and is mean to him.
"THE COURT: Yes, ma'am."

Later, the following exchange occurred:

"[DEFENSE COUNSEL]: I know that the Court has already ruled that I can't ask witnesses about Vickie's prior drinking and how she treated [defendant] when drinking. [¶] My plan is -- and I just want to make sure I'm not in violation of the Court's ruling -- is to ask character witnesses about part of their basis for their opinion that [defendant] is nonviolent and seeing how when Vickie would be mean or aggressive towards him he didn't react and he would avoid confrontation. I think that that's fair game without getting into the alcohol portion to explain their reasoning for why they believe him to be nonviolent and treated her well, but I just don't want to ask that or mention it in opening and be in violation of the Court order.

"THE COURT: [Prosecutor]?

" [PROSECUTOR]: I think the whole nature of the character evidence is to show that she mistreated the defendant. I think that was the thrust of the Court's ruling, excluding the prior drinking.

"THE COURT: We end up getting back to, [defense counsel], that she may have given him a hard time in the past, but we don't know necessarily that she was doing it on the night in question. We do have the one witness that said she looked to be intoxicated and had a bucket or whatever it was, but do we end up getting conduct in conformity there with that she acted mean [on] previous occasions but he didn't react. [¶] So you're not getting into Vickie. You're getting into the fact that when provoked, he did not do anything.

"[DEFENSE COUNSEL]: Right. Which would be the basis for some of their opinions that my client is not violent.

"THE COURT: That's actually a little bit of a backdoor way of getting in that she was mean to him, which we have no idea that that happened on this night. However, your proposition is that he was a mild-mannered guy. [¶] What do you

15.

think about that, [prosecutor], going towards the proposition that it's towards him, not necessarily towards Vickie?

"[PROSECUTOR]: I think that if the character witnesses for the defense testify that he was a calm, mild-mannered guy, disregarding the provocation by the victim, I think those statements would be fine.

"THE COURT: I was thinking about that. [¶] Can you do that, [defense counsel]?

"[DEFENSE COUNSEL]: I think my concern with it is the fact that no opinion -- just saying he's a mild- mannered person or he's nonviolent, it's not the ultimate conclusion that carries the weight. It's the basis for the opinion. [¶] If they're just saying, well, he's nonviolent, but then the argument is going to be they haven't seen him in certain situations, it goes to the weight of their testimony, the fact that they've seen him in situations where he could have been from -- where he was provoked and he could have reacted but he instead chose to avoid confrontation.

"THE COURT: Are you going to call witnesses that will say that when -- the provoker was somebody other than Vickie?

"[DEFENSE COUNSEL]: All of them except for one person says that it was -- that it was always when it was Vickie. I have -- gosh. I have maybe six -- seven or eight character witnesses, and the overwhelming majority is all of them saying when Vickie was provoking him.

"[PROSECUTOR]: Judge.

"THE COURT: Yes.

"[PROSECUTOR]: If the defense was a voluntary manslaughter request for heat of passion or sudden quarrel, that evidence may very well be relevant, but that's not where this case is shaking up to be.

"THE COURT: Funny you mention that, [prosecutor], because somewhere last week I wrote that down. [¶] But if I ask [defense counsel] how she's going to proceed on that, she's not going to tell me.

"[PROSECUTOR]: Well, I understand that it's just an abstract thought at this point because we don't actually have any evidence to analyze whatever is going to happen, right?

"THE COURT: Right.

16.

"[PROSECUTOR]: At some point my case is going to be done and something will happen that may affect the Court's ruling on the testimony that the character witnesses are able to give. If there is evidence of heat of passion or sudden quarrel, then maybe that stuff comes in, but it certainly won't now if the defense, as it stands now -- from what I'm reading, and obviously there's no real evidence of it yet -- that it's a blackout and I don't remember what happened. That is completely different than heat of passion, sudden quarrel. If that makes sense.

"THE COURT: It does. It does. [¶] You almost summarized exactly what I had written down, [prosecutor], in that are we going to get into [voluntary manslaughter] -- we have an interesting area where if the defendant gets up there and says he blacked out, he has no recollection of what was going on, it would be very difficult to argue [voluntary manslaughter] if he can't remember that. Okay? [¶] What I see is you attempting to get in information of [voluntary manslaughter] despite the fact that defendant is going to testify to blackout by saying in the past, she had been real mean to him and he never reacted. [¶] Would that be that, well, on this particular night, since he can't remember, he eventually did react and, therefore, I give the voluntary manslaughter instruction, and that would be -- prevent the People from cross-examining on [voluntary manslaughter] since we have other people saying what he might have done on the night in question, despite the fact him having a blackout. Puts me in a bad spot.

"[DEFENSE COUNSEL]: Do you want my comments?

"THE COURT: Absolutely.

"[DEFENSE COUNSEL]: So I did put this in my in limine motions, in one of the motions. There are so many. It was one related to Dr. Musacco. [¶] I know that the Court has already made its ruling, but my position was that defense should get voluntary manslaughter just based on the fact that [defendant] told Dr. Musacco that they were in an argument on that night, and that she was intoxicated, and that when she's intoxicated is when she gets into the more aggressive arguments with him, and that -- and treats him in a certain way, and how there's also going to be testimony that the week leading up to the incident, that a neighbor heard more arguing coming from the area of the residence, verbal arguments not physical, but it was verbal arguments, that his perceptions of [defendant] and how he knows [defendant] is that [defendant] appeared to be more stressed out and something appeared to be bothering him in a way that he had never seen before with [defendant]; so I think the totality of all of that evidence does get defense to voluntary manslaughter. [¶] I also think that -- and I respect the Court's ruling. I think that the Court's ruling, though, about Vickie and not being allowed to get into how she treated [defendant] takes away part of the basis to get to voluntary manslaughter, but assume it all came in, I would absolutely be

17.

requesting it. [¶] The other request that I do have is I would like to file at least the character witness statements with the Court, at least, so we have the offer of proof for appellate purposes as well as to what the witnesses would be offering on those topics. I know I've stated it on the record, but I would like to file that with the Court, if that's okay, as well, and I can bring that next time.

"THE COURT: You can. [¶] My concern is that if you call witnesses to talk about what led up to all of this, but on the night in question we have nobody testifying that Vickie was riding him to the point where he snapped and he killed her, okay, I don't have any of that information. So I don't know what the relevance is of the fact that Vickie had irritated him in the past as to whether or not she had irritated him on the night in question. [¶] Now, your point is is that it goes to the fact that he has been pushed in the past and he never snapped. Okay? [¶] Doesn't that fall in line with [prosecutor] and help [prosecutor] by saying that, well, they never snapped in the past, what would make him snap this particular night?

"[DEFENSE COUNSEL]: If I may.

"THE COURT: Sure.

"[DEFENSE COUNSEL]: I think that a lot of the evidence in this case can be used both ways. I think that some of, like, what can go for the prosecution it can go for the defense, and I think that's with different things in this case. [¶] I do note that there are -- there is certain case law that says, for instance, if someone in the past -- this is not this case, but if someone in the past has said, 'I want to kill you,' that that can be used as circumstantial evidence for their intention on the night of the incident. [¶] And so I think that when you're getting at with -- and circumstantial evidence is treated the same as direct evidence under the law; so I do think that when there is evidence of an argument on that night and the week leading up to it and escalating the week leading and the argument on that night, I absolutely do think that the past is circumstantial evidence from what was happening on that night that I can use to argue both [defendant's] mental state and the whole situation in its totality. But I also think that they're two separate issues that are already being conflated into one here. Because one is the everything about how she treated him and how that impacted the night at issue as for voluntary manslaughter, that sort of thing. [¶] The other part that is getting conflated, but it's actually a separate issue, is the basis for the character witnesses' opinions that he's nonviolent because it carries much less weight for a character witness to get up on the stand and just say, 'I know [defendant]. He's nonviolent,' versus having specific examples to support their opinion as to why he's nonviolent. [¶] And I do think that if the Court does stand by its previous ruling about the past and how Vickie treated [defendant] and that not being admissible as to what she was doing on the night of the incident, I think the Court could give a

18.

limiting instruction, perhaps, but I think that it's important for the basis of the character witnesses' statements to be able to provide concrete examples, instead of just someone saying nonviolent and not being able to say why.

"THE COURT: [Defense counsel], well done. [¶] I'll tell you what, if you want to file those affidavits with the Court of what you think the witnesses will say, I would like to read those and take a look at it. [¶] I did literally just write down, 'Goes to character of Defendant, not to how Vickie was treating him on that night.' I could write a limiting instruction on that. But let me take a look at what you propound or propose these witnesses are going to say, and then I'll have a better idea about that. I'm not saying no.

"[DEFENSE COUNSEL]: Okay.

"THE COURT: Okay? [¶] Not saying yes, but I'm not saying no. [¶] But you are right. We're going to get into the point on this where I'm not sure when the evidence goes out how the jury is going to take it, either for the prosecution or the defense or somewhere in the middle, which makes this case even more interesting."

### 3. *Revisiting Issue Midtrial*

Midtrial, before defendant testified, defense counsel informed the court of her intent to call several witnesses to testify to defendant's character and "how the victim would treat [defendant] under the influence of alcohol." The court stated:

"I'm going to go ahead and reserve a ruling on the latter until I hear what [defendant] has to say tomorrow. I gave a Court-indicated that it's unlikely that we get into that, but since I have no idea how he's going to testify or what he's going to say, I'll just wait on the back burner, and since they're coming anyway, they can certainly testify as to his character, not a violent person, et cetera. Whether or not we'll get into Vickie's drinking remains to be seen."

After defendant testified, defense counsel renewed the request to have witnesses echo defendant's testimony that Vickie's drinking was bad and getting worse. She argued that such testimony would make defendant's testimony more credible to the jury.

The prosecutor responded, arguing:

"The victim's state of mind is not relevant. Her being intoxicated or her being an annoying bitch that night is not relevant in this particular type of homicide. It might be, depending on what evidence was presented, but we haven't reached that point yet, provocation or heat of passion. [¶] We have a blackout defense where

19.

[defendant] says he doesn't remember anything. So whatever she was doing that night is completely irrelevant. [¶] The fact that she wants -- that [defense counsel] wants to have evidence that corroborates [defendant], I can understand that from a trial perspective, and there's a lot of available evidence that will corroborate [defendant] that does not involve the intoxication of or lack thereof of the victim. That is not a defense to the crimes charged under these facts. [¶] So I think to allow that stuff is irrelevant and unduly prejudicial."

The court observed that this type of evidence would be relevant in a normal case "where we had a defense of provocation." However, in this case, defendant claimed he did not remember the killing. The court observed the evidence might have been relevant if there had been more evidence on defendant's state of mind. The court excluded the witnesses from testifying as to the victim's drinking. Defendant's counsel again requested to introduce evidence that Vickie's BAC was .17 percent, and the court "noted" her objection.

#### 4. *Jury Note*

During deliberations, the jury sent a note saying, " 'Full autopsy.' " The court asked the jury if they wanted " 'the readback of the autopsy.' " The jury responded, " 'No. They wanted the findings of the autopsy, the – the blood alcohol of the victim,' a lot of things like that." The court then conferred with counsel, which agreed with the answer the court gave: "All evidence regarding the autopsy has been presented to you. If you require readback about any of the evidence that was presented on this issue, please advise."

Defense counsel asked to reopen the evidence phase to present Vickie's BAC to the jury (§ 1094), and the court denied that request.

### B. Law

Defendant claims the court erred in excluding Vickie's BAC, and the proffered testimony of friends, family and neighbors indicating Vickie had verbally berated defendant in the past and that it was worse while she was drinking. We conclude below that the court did not err.

20.

### 1. *Heat of Passion*

" 'The heat of passion requirement for manslaughter has both an objective and a subjective component.' " (*People v. Choyce* (2025) 18 Cal.5th 86, 104.)

The subjective component is that "[t]he defendant must actually, subjectively, kill under the heat of passion." (*People v. Choyce*, *supra*, 18 Cal.5th at p. 104.)

"With respect to the objective component, ' "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances." ' [Citation.] To satisfy this objective standard, ' "the accused's heat of passion must be due to 'sufficient provocation,' " ' which must come from the victim. [Citation.] The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim or by conduct reasonably believed by the defendant to have been engaged in by the victim. [Citation.] 'Adequate provocation and heat of passion must be affirmatively demonstrated.' " (*People v. Choyce*, *supra*, 18 Cal.5th at pp. 104-105.)

### 2. *Evidence Code Section 352*

A trial court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Appellate courts "must not disturb the trial court's exercise of discretion ' " 'except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Hinojos* (2025) 110 Cal.App.5th 524, 549.)

### C. Analysis

We conclude the proffered evidence was not enough to raise an inference of heat of passion. Although there may have been relevant evidence on the topic, the evidence

21.

was not substantial.[8]  That is, the evidence was not sufficient to support a reasonable inference of heat of passion.  As explained below, there are far too many speculative leaps from the proffered evidence to heat of passion.  The evidence had very little probative value and was properly excluded under Evidence Code section 352.

### 1.  *Circumstantial Evidence*

First, evidence that a person was seen acting in a particular manner under a particular set of circumstances does not establish that they *always* act in that manner in those circumstances.[9]  Specifically, evidence that Vickie had berated defendant while

---

[8]      Relevance is a very low bar.  The prosecutor, trial court, and the Attorney General overstated their position by arguing the evidence at issue was *irrelevant*.  The evidence is technically relevant as to whether defendant acted with malice.  The Attorney General acknowledges that a killer's state of mind is proven with evidence of provocation but posits that no substantial evidence that defendant's reason was *actually* obscured here.  In other words, the evidence does not establish the subjective prong of heat of passion.  However, evidence relevant to one element of a crime does not become irrelevant simply because other elements of the crime are unproven.

Whether the evidence raises an inference of heat of passion is a different question.  Relevant evidence can merely be consistent with a particular inference, which is not the same as the relevant evidence independently supporting the inference.  "[T]he law distinguishes between facts that can 'logically and reasonably be drawn' from the evidence [citation] versus evidence which 'merely raises a possibility' a particular fact is true.  [Citation.]  The former is called a reasonable inference; the latter is called speculation and is 'not a sufficient basis for an inference of fact.' " (*People v. Bell* (2020) 47 Cal.App.5th 153, 180.)  While the evidence at issue here is technically relevant, that does not mean that heat of passion can "logically and reasonably be drawn" from that evidence, as we discuss later in this opinion.

[9]      On this point, we note that one of the witnesses essentially told the defense investigator that Vickie's conduct while drinking was *not* uniform, stating:

"Vickie did not treat her any differently after she had been drinking.  She said Vickie was mostly a happy drunk with her.  She would see Vickie's mood change with [defendant] after she had been drinking.  [The friend] noticed that *Vickie's mood after she had been drinking depended on how things were with her and [defendant].*  If Vickie had been complaining to her about [defendant] when she was sober, she was *more likely to get moody and sad or upset more easily when she was drunk*."  (Italics added.)

drunk in the past does not mean Vickie always berated defendant while drunk.**10** Consequently, the truly material question remains unaddressed by the evidence – i.e., whether Vickie berated defendant *in this particular instance*.

Defendant correctly points out that circumstantial evidence – not just direct evidence – *can* be substantial. And of course that is true. But not *all* circumstantial evidence is substantial. Some circumstantial evidence only weakly suggests a particular fact is true, while other circumstantial evidence is strong enough to support an inference the fact is true. Only the latter type of evidence is sufficiently "substantial" to merit consideration by a jury.

"Fundamentally, whether evidence 'raises' or 'supports' a particular inference is a matter of probability. Relevant evidence increases the apparent probability a particular fact is true. Some evidence increases that apparent probability greatly, and other evidence does so slightly. There is a point on the spectrum above which the probabilistic connections between the evidence and proposed inference are deemed 'reasonable' and below which weaker probabilistic connections are deemed 'speculation' or 'conjecture.' (Evid. Code, § 600, subd. (b) [an inference is a deduction of fact that may logically and 'reasonably' be drawn from another fact].) In this way, the law distinguishes between facts that can 'logically and reasonably be drawn' from the evidence [citation] versus evidence which 'merely raises a possibility' a particular fact is true. [Citation.] The former is called a reasonable inference; the latter is called speculation and is 'not a sufficient basis for an inference of fact.' " (*People v. Bell*, *supra*, 47 Cal.App.5th at p. 180.)

Thus while circumstantial evidence can be "substantial," other times "circumstantial evidence only *slightly* increases the apparent probability a particular fact is true." (*People v. Bell*, *supra*, 47 Cal.App.5th at p. 180.) "For example, consider

---

**10** This fact does not render the evidence *irrelevant*. Rather, we merely conclude that the evidence does not independently support an inference of heat of passion.

evidence that a defendant was in the same city where a murder occurred.  Certainly, the apparent probability of [the] defendant's involvement is slightly higher if he was in the same city where the crime occurred than if he was in another state.  But at most, we could say such evidence is 'not inconsistent with' the defendant having committed the murder.  [Citation.]  We would not say this evidence 'supports' an inference the defendant committed the murder.  Similarly, the fact a defendant was seen with the killer before and after the murder is insufficient to raise an inference the defendant was involved in the murder."  (*Id.* at pp. 180-181.)

Here, the evidence that Vickie berated defendant while drunk in the past "merely raises a possibility" that she actually berated him while drunk on the specific night/morning in question.

### 2.  *Sufficient Provocation*

Second, even if we do assume Vickie acted in the way the witnesses had seen her act toward defendant while drunk in the past, it would still be speculation to find heat of passion here.  The terms used by the witnesses (e.g., Vickie would cut down defendant verbally, would be "not nice" to him, "disrespectful" and "verbally abusive") each encompass a wide range of verbal conduct.  We do not know where Vickie's conduct fell on this spectrum on the night/morning in question.  This is crucial, because while defendant argues that words alone *can* be sufficient provocation (see *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1147), they rarely are.  (See, e.g., *People v. Gutierrez* (2009) 45 Cal.4th 789, 826-827; *People v. Manriquez* (2005) 37 Cal.4th 547, 585-586; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739.)  The jury had no grounds to determine which the case here was.

### 3.  *Subjective Prong of Heat of Passion*

Third, the evidence proffered by the defense goes only to the objective prong of heat of passion.  Even if that prong were undoubtedly satisfied, heat of passion does not apply absent evidence of the subjective prong as well.  The only evidence we have on

24.

that issue arguably cuts *against* defendant.  The proffered testimony indicated that defendant did not react negatively to Vickie's "verbal abuse" in the past.  If anything, this is circumstantial evidence that defendant would not have reacted with his reason obscured if/when Vickie berated him before the killing.  In any event, there is no affirmative evidence that defendant's reason was obscured.

There are simply too many speculative steps from the proffered evidence to infer heat of passion.  Because heat of passion was not a viable theory, without more, the probative value of the evidence was virtually non-existent.

In contrast, the evidence posed a risk of undue prejudice.  The evidence was essentially character evidence, offered to prove that on a specific occasion Vickie acted in conformity with prior bad acts.  The risk inherent to nearly all negative character evidence is that the jury will not limit its consideration of the evidence to its allowable purposes but will instead seek to punish the person for their prior bad acts or character.  The specific risk here is that the jury would base its decisions, in part, on inflamed emotion/reduced sympathy for the victim.

Because the evidence posed a risk of undue prejudice and had very little probative value, we cannot say the trial court's exclusion of the evidence was " ' " 'arbitrary, capricious or patently absurd.' " ' " (*People v. Hinojos*, *supra*, 110 Cal.App.5th 524 at p. 549.)

## II.     The Court Did Not Err in Declining to Instruct the Jury on Heat of Passion

Defendant claims the court erred in declining to instruct the jury on heat of passion.

### A.  Additional Background

The defense requested that the court instruct the jury with CALCRIM No. 570 on heat of passion voluntary manslaughter.  Defense counsel emphasized that defendant testified he and Vickie were having arguments that escalated the week prior to the killing, that he was " 'mad as hell' " at one point, and that they often resumed arguing after a

cool-down. She also pointed to evidence that defendant told officers he had finally lost it.

The court denied defense counsel's request and did not instruct the jury with CALCRIM No. 570. The court observed that since defendant testified he had blacked out, there was no evidence "as to what it was that set him off or what it was that put him in the position of a voluntary [manslaughter] type of mental state."

## B. Law

"[T]o warrant instructions on provocation and heat of passion, there must be *substantial evidence* in the trial record to support a finding that, at the time of the killing, [the] defendant's reason was (1) actually obscured as a result of a strong passion; (2) the passion was provoked by the victim's conduct; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from due deliberation or reflection." (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1481, italics added.)

The need for instruction arises not upon " 'the existence of "any evidence, no matter how weak," ' " but rather upon evidence " ' "substantial enough to merit consideration" by the jury.' " (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

## C. Analysis

As explained in the previous section of this opinion, we concluded that the evidence proffered by the defense but excluded by the trial court was insufficient to support an inference of heat of passion. However, defendant also contends that evidence admitted at trial was independently sufficient to warrant a heat of passion instruction. He cites evidence that his arguments with Vickie escalated in the month of June and especially during the week before her death; on the evening of June 29, 2020, he came home to find his wife "drunker than usual" and unable to sit up; and they argued with Vickie being "mad as hell" at defendant's questions. Defendant acknowledges his

26.

testimony that they reached a state of calm before he went to bed, but notes that sometimes in the past their arguments could resume after a period of calm.

None of the evidence alters our conclusion. Again, the evidence still boils down to this: Vickie sometimes berated defendant when drunk, she was drunk on the night in question, the two argued and then calmed down. Again, finding heat of passion on this evidence would be speculation. First, it is speculative to infer that the argument resumed later. To the contrary, the evidence indicated that the argument had ended, they were calm, and that the defendant kissed Vickie on the forehead *and went to sleep*. It is pure speculation that defendant might have later woken up and resumed the argument with Vickie.

Even if there had been evidence of a resumed argument, it would still be speculation to find heat of passion. Because evidence of an argument without specific evidence of what was said and done during the argument is not evidence of sufficient provocation. As we have noted, while words alone could theoretically be sufficient provocation in some limited circumstances (see *People v. Millbrook*, *supra*, 222 Cal.App.4th at p. 1147), they do not suffice in many other circumstances. (See, e.g., *People v. Gutierrez*, *supra*, 45 Cal.4th at pp. 826-827; *People v. Manriquez, supra,* 37 Cal.4th at pp. 585-586; *People v. Lucas*, *supra*, 55 Cal.App.4th at p. 739.) This is a very fact-intensive, case-specific question for which there was insufficient evidence upon which to formulate an answer. That is why it would have been improper to submit the issue to the jury. The court did not err in declining to instruct on heat of passion.

## III.    CALCRIM No. 626 Did Not Shift Burden of Proof to Defendant

Defendant claims that CALCRIM No. 626, given by the trial court in this case, improperly shifted the burden of proof to him.

### A.  Law

"When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-

27.

intoxicating to that point, and is treated as involuntary manslaughter." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.)

The prosecution bears the burden of proving every element of the charged crime(s), and that burden cannot be shifted to the defendant. (E.g., *Sandstrom v. Montana* (1979) 442 U.S. 510, 524.)

"We must consider the [jury] instructions together as a whole, to determine whether it is reasonably likely a jury would interpret an instruction in a particular way, because we presume jurors understand and correlate all of the instructions." (*People v. Burton* (2018) 29 Cal.App.5th 917, 925.)

## B.  Court's Instructions

The court instructed the jury:

"A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt…  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he's entitled to an acquittal and you must find him not guilty."

The court later gave CALCRIM No. 626 as follows:

"Voluntary intoxication may cause a person to be unconscious of his or her actions.  A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions.

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect.

"When a person voluntary[ily] causes his or her own intoxication to the point of unconscious, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life.  If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.  Involuntary manslaughter has been proved if you find beyond a reasonable doubt that, one, the defendant killed without legal justification or excuse; two, the defendant did not act with the intent to kill; three, the defendant did not act with a conscious disregard for human life;

28.

and four, as a result of voluntary intoxication, the defendant was not conscious of his actions or the nature of those actions.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder."

## C. Analysis

We agree that there is something unusual about elements of a crime requiring findings that that the defendant did *not* intend to kill, did *not* act with conscious disregard for human life and was *not* conscious of his actions or their nature. However, what matters here is that the instruction did not shift the burden of proof to defendant.

By definition, a defendant bears the burden of proof when the instructions provide for a negative consequence to the defendant if there is a failure of proof. Here, however, the instructions make clear that if there is a failure of proof as to the elements of a crime (e.g., involuntary manslaughter), then defendant is *not* to be convicted of that crime. As noted above, the court told the jury,

> "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt… Unless the evidence proves the defendant guilty beyond a reasonable doubt, he's entitled to an acquittal and you must find him not guilty."

Consider the hypothetical posed by the defendant himself. What if the jury found defendant killed without legal justification/excuse, did not act with intent to kill, did not act with a conscious disregard for human life, but was "dissatisfied with the state of the evidence on the question" of whether defendant was conscious of his actions or their nature? In other words, the first three elements of involuntary manslaughter were proven beyond a reasonable doubt, but the fourth was not. In this circumstance, the instructions make quite clear what the jury would have to do: acquit defendant of both involuntary manslaughter and murder. First, the instructions would have the jury acquit of involuntary manslaughter because one of its four elements was not proven as required.

29.

(CALCRIM No. 626 ["Involuntary manslaughter has been proved *if* you find beyond a reasonable doubt that" all four elements are true (italics added)].) Second, the instructions would have the jury acquit of murder because the jury was told: "The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder." Thus, a failure of proof as to the consciousness element would have defendant acquitted of involuntary manslaughter and murder. Obviously, a defendant does not bear a burden of proof if the failure to carry the burden results in a favorable outcome.

Because the instructions make clear the prosecutor bore the burden of proof – even as to the elements that are counterintuitive – there was no chance the jury concluded defendant bore the burden of proof. Even defendant acknowledges that the "obvious candidate for proving any element of any offense beyond a reasonable doubt was the prosecutor." We would take it a step further and say, as the instructions made clear, the *only* candidate for proving an element of an offense beyond a reasonable doubt was the prosecutor.

Defendant argues it is absurd to require a prosecutor to prove intent to kill and lack of intent to kill at the same time, and a desire to avoid that potential absurdity would have led the jury to conclude defendant bore the burden of proof. We see no absurdity. The instructions require proof of intent to kill *in order to establish murder* and proof of lack of intent to kill *in order to establish involuntary manslaughter*.

For these reasons, we conclude CALCRIM No. 626 did not shift the burden of proof to defendant.

## IV. Certain Portions of Vickie's Text Messages Were Inadmissible Hearsay Because They Were Not Supported By Independent Evidence Defendant Was Aware of Her State of Mind

Defendant contends the court erred in admitting Vickie's text messages to Denise O.

### A. Additional Background

As described in the factual summary of the trial evidence near the beginning of this opinion, evidence of text messages between Vickie and her friend Denise were admitted at trial. These messages had previously been the subject of in limine proceedings described below.

Before trial, the prosecution sought admission of the messages as evidence of Vickie's state of mind and defendant's motive for murder. (Evid. Code, § 1250.) Defendant sought to exclude the messages on hearsay, confrontation clause, and character evidence grounds.

The court indicated that the text messages would likely be admitted under Evidence Code sections 1250 and 1252 – except for references to rape which were excluded as unduly prejudicial. The court observed that the evidence suggested "defendant was aware of her intent to call law enforcement and would go directly to motive for the murder." )

The text messages were ultimately admitted at trial except for the rape allegations, which were redacted.[11]

In closing argument, the prosecutor read the text messages, and noted the last one was sent at 11:30 p.m. the evening before she was killed. In discussing the text messages during closing argument, the prosecutor stated the jury could "evaluate the statements for the truth." He stated the text messages were evidence defendant had been "attacking" her

---

[11] According to the People's trial brief, Vickie texted Denise, "So only telling u..pls don't tell jeff6..but [defendant] raped last night and he choked me..pls don't tell anyone." In the message admitted in evidence, the phrase "raped last night and he" was redacted.

Vickie also texted Denise, " 'I'm ok and yes he was drinking but that's no excuse..he's done this twice to me and ive only been raped twice,, so guess who's doing it,, he keeps apologizing and professing his love…I told him the next time this happens I will call the police and he will go away for along [*sic*] time.. [redaction].' " In the message admitted in evidence, the phrase "and ive only been raped twice,, so guess who's doing it,," was redacted.

for days.  The prosecutor also claimed that Vickie's text messages demonstrated an "[e]xcellent motive for murder."

Defense counsel sought to undermine the text messages in closing argument.  She told the jury, "I'm not conceding as to the validity of what was in the text messages, because as you heard, they came from a questionable source, but if you do believe what's in the text messages, you learned that, according to Vickie, that is when [defendant] was drinking; so that also follows that he was drinking on this date as well."

### B. Law

Evidence Code section 1250 provides, in part,

"(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; *or*

(2) The evidence is offered to prove or explain acts or conduct of the declarant."  (Evid. Code, § 1250, italics added.)

Even if a statement satisfies section 1250, it is inadmissible if it "was made under circumstances such as to indicate its lack of trustworthiness."  (Evid. Code, § 1252.)  " 'A statement is trustworthy within the meaning of section 1252 of the Evidence Code when it is " 'made in a natural manner, and not under circumstances of suspicion.' " ' " (*People v. Dworak* (2021) 11 Cal.5th 881, 907.)

"[E]vidence of the decedent's state of mind, offered under Evidence Code section 1250, can be relevant to a defendant's motive—but only if there is independent, admissible evidence that the defendant was aware of the decedent's state of mind before the crime and may have been motivated by it." (*People v. Riccardi* (2012) 54 Cal.4th 758, 820, disapproved on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

"On appeal, determination of preliminary facts by the trial court made in the course of deciding the admissibility of hearsay evidence will be upheld if supported by substantial evidence." (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 831, disapproved on other grounds by *People v. Rangel*, *supra*, 62 Cal.4th at p. 1216.) Findings on preliminary facts can be implied findings. (E.g., *People v. Kerley* (2018) 23 Cal.App.5th 513, 559.)

## C. Analysis

Both parties agree that the statements (1) "I told him the next time this happens I will call the police and he will go away for along [*sic*] time," and (2) "there's a good chance he might [be] arrested after work tomorrow" were hearsay.[12] The Attorney General contends the statements were still admissible, however, under Evidence Code section 1250 "because they reflect Vickie's mental state and were offered to prove her conduct, including her future conduct in accordance with her expressed intent. The statements by Vickie were relevant because they showed Vickie's intent to contact law enforcement, which was probative of [defendant's] motive for the killing."

The Supreme Court's opinion in *Riccardi* imposes an additional requirement on motive evidence offered under Evidence Code section 1250. Namely, that "evidence of the decedent's state of mind, offered under Evidence Code section 1250, can be relevant to a defendant's motive—but *only if there is independent, admissible evidence that the defendant was aware of the decedent's state of mind before the crime and may have been motivated by it*." (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 820.) This requirement appears nowhere in the text of Evidence Code section 1250. In imposing this requirement, *Riccardi* cited cases from other states, but nothing from California. If *Riccardi* were a decision from a court of appeal, we would decline to follow it. As it is a Supreme Court decision, we must apply it here.

---

**12** The Attorney General also acknowledges that the statement "I'm ok" was hearsay. Defendant contends that all of the key assertions in the text messages were hearsay.

The Attorney General contends there was sufficient independent evidence as required by *Riccardi*.  First, he points to testimony from a neighbor that he heard arguing from defendant's house in the months leading up to Vickie's death and defendant appeared visibly agitated just days prior to her death.  While this evidence is relevant and helpful to the prosecution, it is not evidence defendant was aware that Vickie did or planned to call law enforcement.

The Attorney General also cites defendant's testimony stating he and Vickie had frequent arguments in June 2020, which increased in intensity and frequency in the week leading up to her death, that he told Dr. Musacco he was upset with Vickie on the day she died because she had been sneaking alcohol, and that Vickie was angry with him too.  Again, none of this evidence indicates defendant was aware that Vickie did or planned to call police.

There was insufficient *independent* evidence defendant knew Vickie intended to/did contact law enforcement, so the hearsay portions of the text messages could not be properly admitted as evidence of motive under Evidence Code section 1250 pursuant to *Riccardi*.

### D.  Non-hearsay Statements

Before turning to whether this error was prejudicial, we note that some portions of the text messages were not hearsay and therefore will not be considered in the prejudice analysis.  Specifically, Vickie's statements describing defendant's violence towards her (e.g., that defendant "choked" her, and had "done this twice," and that he had "just beat the fuck out of me all over the living room") were not hearsay.  Instead, they were "*indirect* declarations of her state of mind, because they contained *descriptions or assessments of defendant's conduct* that engendered [her] fear or altered her conduct." (*Riccardi*, *supra*, 54 Cal.4th at p. 823, italics added.)

Defendant counters that "the claims about [defendant's] alleged violent conduct were hearsay if they were admitted to prove that the conduct happened."  But the

34.

People's motion in limine offered the text message statements to prove Vickie's state of mind.

Defendant analogizes *People v. Sanchez* (2016) 63 Cal.4th 665, where the Supreme Court observed that when evaluating an expert's opinion, juries must also consider the truth or falsity of the facts upon which the opinion is based. Defendant rephrases *Sanchez*'s holding to fit the present case as follows: " 'If [*a witness conveys*] case-specific out-of-court statements to explain the bases for his [*state of mind, intent, or plan*], those statements are necessarily considered by the jury for their truth, thus rendering them hearsay.' " (*Id.* at p. 684.) Importing *Sanchez*'s holding from its distinguishable context contravenes *Riccardi*'s conclusion that indirect statements of the declarant's state of mind that contain descriptions or assessments of defendant's conduct are *not* hearsay. We see no reason to disregard *Riccardi*'s on-point discussion in favor of a discussion in the distinguishable context of an expert opinion.

### E. Harmlessness

We next ask whether the error in admitting the hearsay portions of the text messages was prejudicial. Our state Constitution requires us to use the *Watson*[13] standard for prejudice. Under *Watson*, we only reverse if " 'after an examination of the entire cause, including the evidence,' " it appears "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.)

Defendant disagrees, contending the error violated his federal constitutional right to due process and a fair trial. We disagree. "[A]s a general matter, the federal Constitution does not mandate particular rules concerning the admission of evidence." (*People v. Fuiava* (2012) 53 Cal.4th 622, 698.) " '[O]nly when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice," [citation], [has the

---

**13**     *People v. Watson* (1956) 46 Cal.2d 818.

court] imposed a constraint tied to the Due Process Clause.' " (*Ibid.*) Our Supreme Court has applied *Watson* to analogous errors, and we will do so here. (E.g., *People v. Flores* (2020) 9 Cal.5th 371, 411.)

We conclude that while the evidence was helpful to the prosecution, it is not reasonably probable defendant would have achieved a better result if the evidence had been excluded. The hearsay evidence bore directly on motive. However, motive is not an element of defendant's charged crimes. While motive is relevant, it is merely indirect evidence of the ultimate issues bearing on the jury's verdict. It is true that evidence defendant had a motive to kill Vickie tends to prove the killing was not accidental, but that inference was independently supported by other evidence. Specifically, the nature of Vickie's injuries, the defendant's statements while in police custody, the substantial arguments between defendant and Vickie including on the night in question, and the consciousness of guilt suggested by the arson and attempt to flee.

Moreover, the defense relied, in part, on the text messages to support its voluntary intoxication theory. Specifically, defense counsel argued to the jury that the text messages suggested defendant was drinking on the day in question. Consequently, in the *Watson* counterfactual where the evidence was properly excluded, defense counsel would not have been able to make this specific argument.

In sum, we conclude that it is not reasonably probable defendant would have had a more favorable outcome if the hearsay statements had been excluded.

## V. DEFENDANT SUFFERED NO PREJUDICE FROM THE EXCLUSION OF THE PROFFERED STATEMENT VICKIE ALLEGEDLY MADE TO DENISE O. OVER THE PHONE

Defendant contends the court prejudicially erred by excluding a statement Vickie allegedly made to Denise over the phone.

## A. Additional Background

As described in the factual summary of this opinion, Vickie's friend Denise Denise testified at trial. During cross-examination, defense counsel requested a sidebar with the court.

Defense counsel put the sidebar discussion on the record later, saying she had requested to introduce certain evidence under Evidence Code section 356. She observed that one of Vickie's text messages stated, "He keeps apologizing and professing his love." Defense counsel stated that, under the rule of completeness, she wanted to introduce evidence of statements made during a phone call between Vickie and Denise. Specifically, that Vickie had told Denise on the phone that defendant would drink to the point of blacking out, and would not remember what he had done. Defense counsel offered that to indicate that defendant was only apologizing as to what he had *been told* he had done, not anything he actually remembered to have done. The prosecutor responded that the defense's true reason for wanting the evidence in was not to offer context to the text messages, but instead to begin setting up the broader "blackout" defense.

The court denied the defense request to admit the evidence, but said it would review legal citations provided by defense counsel and that they could revisit the issue. Defense counsel later renewed the request, but it was denied.

## B. Law

"Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." (Evid. Code, § 356.)

" ' "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." ' " (*People v. Hardy* (2018) 5 Cal.5th 56, 104.) " ' " '[T]he courts do not draw narrow lines around the exact subject of inquiry. "In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with*, the admission or declaration in evidence." ' " ' " (*People v. Clark* (2016) 63 Cal.4th 522, 600.) This includes admission of portions " 'of the same interview or conversation, even if they are self-serving' so long as they ' "have some bearing upon, or connection with, the admission ... in evidence." ' " (*People v. Johnson* (2022) 12 Cal.5th 544, 604.)

"A trial court's ruling under Evidence Code section 356 is reviewed for abuse of discretion." (*People v. Johnson*, *supra*, 12 Cal.5th at p. 605.) " 'To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it "falls outside the bounds of reason." [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be "established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Johnson*, *supra*, 12 Cal.5th at pp. 605-606.)

The *Watson* standard for prejudice applies to claims of error under Evidence Code section 356. (E.g., *People v. Riccardi*, *supra*, 54 Cal.4th at p. 804.) Accordingly, we ask whether it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

### C. Analysis

Defendant claims the court's refusal to admit the proffered evidence was prejudicial error.  We conclude the exclusion was not prejudicial because it is not reasonably probable that the admission of the proffered evidence would have led to a more favorable outcome for defendant.  We therefore do not reach the question of error.

The proffered evidence would have suggested that defendant sometimes got inebriated to the point of blacking out.  It would not have shown that defendant was in such a state during the relevant timeframe for Vickie to be able to make up instances of violence leaving defendant no choice to accept that they happened.  While the evidence was technically relevant, it was only marginally probative as to whether defendant committed the acts of violence claimed by Vickie.  In contrast, defendant directly and expressly testified that he was never violent with Vickie in June 2020.  Given the direct testimony undermining Vickie's text message claim of domestic violence in June 2020, there is no reasonable probability that offering less direct, marginally-probative, second-hand, cumulative evidence on the issue would have altered the ultimate outcome in defendant's favor.

### VI.    NO CUMULATIVE PREJUDICE

Defendant claims the errors addressed in parts I-V of this opinion were cumulatively prejudicial.  However, we concluded that the erroneous admission of hearsay statements in the text message was not prejudicial.  The only other possible prejudice to consider is the court's exclusion of evidence suggesting defendant's admission to prior bad acts was not based on personal recollection but instead what he was told.  As stated in the preceding section, the risk of prejudice with this alleged error is profoundly low because defendant was able to adduce far more direct and probative evidence on the topic:  his own testimony denying violent behavior towards Vickie in June 2020.

39.

Consequently, we are left with an error of modest detriment to the defense case and an alleged error of exceedingly low detriment. Together, these do not aggregate to constitute prejudice.

## VII. ABSENCE OF PERSONAL JURY TRIAL WAIVER BY DEFENDANT REQUIRES REVERSAL OF SENTENCE

Defendant challenges the court's imposition of the upper term of eight years in prison on count 2 (arson of an inhabited structure). He contends the court improperly found the crime was committed in a manner that indicates planning, sophistication or professionalism after improperly relying upon counsel's waiver of the right to a jury trial, instead of defendant's personal waiver. The Attorney General concedes error but contends it is harmless beyond a reasonable doubt.

### A. Law

Under certain circumstances, a sentencing court can aggravate the defendant's sentence when the crime was committed in a manner that "indicates planning, sophistication, or professionalism." (Rule 4.421(a)(8).) The factor may be used to aggravate the sentence when the court is convinced that the level of planning, sophistication, " 'when compared to other ways in which such a crime could be committed' [citation], make the crime committed by the defendant 'distinctively worse than the ordinary.' " (*People v. Charron* (1987) 193 Cal.App.3d 981, 994-995.) When a court improperly relies upon a factor that was not properly proven at a jury trial, the error "is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence." (*People v. Lynch* (2024) 16 Cal.5th 730, 768.)

### B. Analysis

Defense counsel agreed to a court trial of the sentencing allegations, but there is no indication defendant himself personally waived a jury trial. (See Cal. Const. art. I, § 16 ["A jury may be waived in a criminal cause by the consent of both parties expressed

in open court by the *defendant and* the defendant's counsel." (italics added)]; *People v. French* (2008) 43 Cal.4th 36, 47 ["When the constitutional right to jury trial is involved, we have required an express waiver even in cases in which the circumstances make it apparent that all involved—the trial court, the prosecutor, defense counsel, and the defendant—assumed that the defendant had waived or intended to waive the right to a jury trial."].) The Attorney General acknowledges the error, but contends it was harmless.

The Attorney General argues there is no reasonable doubt that a jury would have found defendant committed count two in a manner that "indicates planning, sophistication, or professionalism." (Rule 4.421(a)(8).) The Attorney General relies on the evidence that defendant started two fires in separate parts of the house, placed a fuel can under a mixing bowl, and fled the house after starting the fire. We acknowledge that a factfinder *could* infer planning, sophistication, or professionalism from the multiple fires and purported attempt to hide the fuel. We cannot say it is overwhelming evidence, nor dispel all reasonable doubts a jury could have possible found the factor untrue.

First, we fail to see how fleeing the house after starting the fire is evidence of planning, sophistication, or professionalism at all.

Second, while starting two fires and potentially attempting to hide one fuel source indicates some level of sophistication or professionalism beyond the alternative, it is only moderately persuasive evidence on the issue. Setting a second fire is not a particularly compelling indicator of sophistication or professionalism, except that it is modestly more thorough than setting one fire. Evidence that the defendant may have tried to hide the fuel source under a mixing pot shows somewhat more sophistication than a typical arson, but not overwhelmingly so given that it was quickly discerned by the arson investigator.

In sum, while there was evidence from which a factfinder *could* have accepted the prosecution's position,[14] it was not so overwhelming as to dispel all reasonable doubts

---

[14]    As a result, we reject defendant's substantial evidence challenge.

any reasonable juror could have found the factor untrue. Under the present standard of review, we must find the error prejudicial and remand for resentencing.

## VIII. TRIAL COURT'S RELIANCE ON DEFENDANT'S PRIOR CONVICTIONS WITHOUT CERTIFIED COPIES IN THE RECORD WAS ERROR

Defendant argues the court's aggravation of count 3's sentence was improper.

### A. Additional Background

The amended information filed April 26, 2023, alleged five sentencing factors as to count 3. Specifically, that the crime involved great violence or bodily harm, etc. (rule 4.421(a)(1)), defendant was armed with a weapon (rule 4.421(a)(2)), the victim was particularly vulnerable (rule 4.421(a)(3)), the manner the crime was committed indicates planning, sophistication or professionalism (rule 4.421(a)(8)), and that defendant took advantage of a position of trust (rule 4.421(a)(11)).

At the court trial on the sentencing allegations, the prosecutor "submitted" as to the allegations for count 3. After announcing its decisions as to sentencing allegations on other counts, the court stated it "will make no findings as to Count 3." The minute order for the hearing stated the court found all of the enhancement allegations as to count 3 not true.

At sentencing, the court spoke before outlining the individual sentences on each count,

> "After review of the factors referenced in aggravation, the upper term is warranted. Regarding any potential upper term selections, 1170(b) of the Penal Code requires specific facts that arise from the crime to be pled and proven to select the upper term for the crime and enhancements. However, pursuant to 1170(b)(3) of the Penal Code, the Court may consider the defendant's prior convictions as specified in the selection of the upper term for the crime but not the enhancements without being pled and proven. Thus, *this sentence stems from the defendant's prior record* and/*or* [what] was found true by the Trial Court, as I stated." (Italics added.)

The court imposed the upper term of three years on count 3.

**B. Law**

"The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)

One exception to this rule is that "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3) ["notwithstanding" subd. (b)(2)].)

**C. Analysis**

Both parties allege an error with respect to the sentencing on count 3. The Attorney General says the court improperly relied on defendant's prior convictions without certified copies of the records of those convictions. Accordingly, the Attorney General asks for a remand for resentencing. Defendant says that because the prosecutor did not present any argument or evidence on the five rule 4.421 allegations on count 3, it should not have a chance to seek aggravation on remand.

It is true that the prosecutor simply "submitted" on the five factors under rule 4.421 attached to count 3, without providing additional evidence or argument. It is also true that the court found those five factors untrue as to count 3. However, defendant argues that because the factors were found not true, the upper term is now "categorically unavailable." Apart from the factors under rule 4.421, sentencing courts may also "consider the defendant's prior convictions." (§ 1170, subd. (b)(3).) Consequently, the fact that the court found the five rule 4.421 factors not true is no barrier to aggravating the sentence based on defendant's prior convictions pursuant to section 1170, subdivision (b)(3). Accordingly, we reject defendant's claim.

However, the Attorney General notes that the only evidence of the prior convictions in the record was the probation report. That does not suffice, because section 1170, subdivision (b)(3) requires that the finding be "based on a certified record of conviction." (§ 1170, subd. (b)(3).) Because defendant is going to be resentenced on other grounds as well, the prosecution will have the opportunity to provide certified records at resentencing.

### D. Conclusion

For the reasons explained, we reject defendant's claims of trial error, but will remand for resentencing due to sentencing error. Because of these conclusions, we do not reach defendant's remaining contentions.

## DISPOSITION

Defendant's sentence is reversed and the matter remanded for resentencing. In all other respects the judgment is affirmed.

GUERRA, J.[*]

WE CONCUR:

HILL, P. J.

SNAUFFER, J.

---

[*]    Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.